JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA RENEE BRYANT and DOROTHY BRYANT, | CASE NO. 2:11-CV-6387-SVW-JC |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

1

On April 20, 2009, Alonzo Bryant ("Decedent") was admitted to the United States Department of Veteran Affairs' Long Beach Healthcare System (the "VA") to Alonzo Bryant ("Decedent") where he remained until his death on October 22, 2009. By the time he was admitted to the VA, Decedent was already in bad physical shape: he had fallen in January of 2009, and spent the next three months at various hospitals and nursing homes. During that time, Decedent's physical condition deteriorated: he contracted several infections, developed pressures sores on his heel and tailbone, and was malnourished. In spite of his poor physical condition, the VA kept Decedent alive for another six months.

After his death, Decedent's daughter, Cynthia Renee Bryant, and his wife, Dorothy Bryant (Decedent's wife, "Dorothy") (together, "Plaintiffs") filed the instant action against the United States (the "Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et. seq.* (Dckt. 1.). In their complaint, Plaintiffs asserted that the VA's treatment of Decedent fell below the standard of care in several ways, and that each failure caused Decedent's death. On January 22, 2013, this Court conducted a bench trial pursuant to 28 U.S.C. § 2402. At trial, the parties presented the following evidence:

Plaintiff's Testimonial Evidence

1.  Trial Declaration of Dr. Carl Thomas Boylen, Plaintiff's Expert (hereinafter, "Boylen Decl.");

2.  Trial Declaration of Cynthia Renee Bryant, Decedent's daughter (hereinafter, "Bryant Decl.")

3.  Trial Declaration of Twyman Owens, Cynthia Bryant's husband (hereinafter "Owens Decl.")

<u>Defendant's Testimonial Evidence</u>

1.    Trial Declaration of Dr. Andrew Fishmann, Plaintiff's Expert (hereinafter, "Fishmann Decl.");

2.    Testimony of Katharine Woo, a nurse manager at the VA (hereinafter "Woo Decl.");

3.    Trial Declaration of Linda Edgar, the Certified Wound, Ostomy, and Continence Nurse at the VA (hereinafter "Edgar Decl.")

4.    Trial Declaration of Dr. Thomas Waddington, a doctor at the VA who treated Decedent (hereinafter "Waddington Decl.");

5.    Trial Declaration of Dr. Farhad Mazdisian, a doctor at the VA who treated Decedent (hereinafter "Mazdisian Decl.").

<u>Documentary Evidence</u>

1.    Exhibit 1: Decedent's medical records from his stay at the VA (a 5,300 page exhibit);

2.    Exhibits 2-5 and 8: Decedent's medical records from his stays at various other healthcare facilities before his admission to the VA in April of 2009;

3.    Exhibit 6: Photographs of Decedent during his time at VA;

4.    Exhibit 7: Decedent's Advanced Health Care Directive;

5.    Exhibits 9-10: Decedent's Autopsy;

6.    Exhibit 11: An e-mail sent by Cynthia to a physician at VA;

7.    Exhibit 12: An article entitled "Preventable Medical Injuries in Older Patients";

8.    Exhibit 13: Pictures of the Bryant Family.

Having considered the parties' legal and factual arguments, the Court issues the following findings of fact and conclusions of law.

## I. WRONGFUL DEATH

### A. Jurisdiction

"The FTCA provides a limited waiver of the sovereign immunity of the United States 'for injury or loss of property ... caused by the negligent *or wrongful act or omission* of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*.'" Xue Lu v. Powell, 621 F.3d 944, 951 (9th Cir. 2010) (quoting 28 U.S.C. § 1346(b)(1)) (emphasis added). Thus, the rules of liability under the FTCA are furnished by state law. See Am. Cargo Transp., Inc. v. United States, 625 F.3d 1176, 1181 (9th Cir. 2010) ("[C]ourts have held that the FTCA applies only if state law would impose liability on private persons under similar circumstances.") (internal citations and quotation marks omitted). The events giving rise to the instant dispute occurred in Long Beach, California; thus, Plaintiffs asserted a wrongful death action under California Code of Civil Procedure Section 377.60. The Government does not dispute that the FTCA's waiver of sovereign immunity applies to Plaintiffs' wrongful death claim.[1]

---

[1] The Court takes up the Government's contention that the FTCA's waiver of sovereign immunity does not apply to Plaintiffs' Elder Abuse Act claim below, see infra Section II.A.

4

**B. Legal Standard: Duty and Causation**

Section 377.60 of California's Code of Civil Procedure authorizes a "wrongful death action by specified persons including the decedent's spouse and children." Ruiz v. Podolsky, 50 Cal. 4th 838, 844 (2010). "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." Boeken v. Philip Morris USA, Inc., 48 Cal. 4th 788, 806, 230 P.3d 342, 354 (2010) (internal citations and quotation marks omitted). Here, the relevant tort is negligence; more specifically, medical malpractice. Under California law, the elements for medical malpractice are: "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." Johnson v. Superior Court, 143 Cal. App. 4th 297, 305 (2006).

"The standard of care in a medical malpractice case requires that medical service providers exercise . . . that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." Barris v. County of Los Angeles, 20 Cal. 4th 101, 108 n. 1 (1999). The standard of care in a medical malpractice case is a matter "peculiarly within the knowledge of experts;" as such, "expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a lay person." Johnson, 143 Cal. App. 4th at 305 (internal citations and quotation marks omitted).

"The causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty . . . was a substantial factor in

bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability." Mayes v. Bryan, 139 Cal. App. 4th 1075, 1093 (2006) (internal citations and quotation marks omitted). In the context of medical malpractice actions, causation is "proven when a plaintiff produces sufficient evidence to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability that plaintiff would have obtained a better result." Id. (internal citations and quotation marks omitted). Moreover,

> "[t]he law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury."

Miranda v. Bomel Const. Co., Inc., 187 Cal. App. 4th 1326, 1336 (2010) (quoting Jones v. Ortho Pharmaceutical Corp., 163 Cal. App. 3d 396, 402-03 (1985)).

Plaintiffs argue that the VA's treatment of Decedent fell below the standard of care in the following five respects: first, that the VA failed to prevent Decedent from aspirating; second, that it failed to prevent Decedent from developing bed sores; third, that it failed to prevent Decedent from contracting hospital-acquired infections; fourth, that it failed to prevent Decedent from becoming malnourished; and, fifth, that it negligently changed Decedent's status from "full code"—i.e. the implement of all life-saving procedures upon respiratory or cardiac arrest—to Do Not Resuscitate. Moreover, Plaintiffs contend that each failing was a substantial factor in causing Decedent's death.

## C. Aspiration

"Aspiration is the general term to describe when the patient swallows material, such as fluid, food particles or bacteria on the nose or moth, and that material travels to the lungs as opposed to the stomach. Aspiration pneumonia develops when such material causes an infection in the lungs." Fishmann Decl. ¶ 48.[2] The experts largely agreed that, while Decedent was being fed via G-tube,[3] the standard of care required the VA to 1) keep the head of Decedent's bed elevated to at least 30 degrees; and 2) to check Decedent's residuals at least every four hours.[4] See Boylen Decl. ¶ 19 ("[Decedent] was at an extremely high risk for aspiration and it was necessary for VA Long Beach staff to follow strict aspiration precautions such as keeping the head of his bed elevated, checking residual volume before tube feedings and monitoring [Decedent] during tube feedings."); see also Fishmann Decl. ¶ 47 ("When a patient is on a G-tube, the community standard of care is to implement two main practices. First, the staff must keep the head of the patient's bed elevated higher than 30 degrees. Second the staff must 'check residuals' . . . .

-----

[2] Because Plaintiffs did not introduce any affirmative evidence explaining what aspiration and aspiration pneumonia is, the Court relies upon Dr. Fishmann's (Defendant's expert) opinion. In his testimony during the bench trial, Plaintiffs' expert Dr. Boylen agreed with Dr. Fishmann's explanation of what aspiration is and how it can lead to aspiration pneumonia.

[3] A "G-tube" is a feeding tube inserted directly into the patient's stomach. Fishmann Decl. ¶ 46. Decedent had a G-tube placed on June 1, 2012. Id.

[4] "Checking residuals" refers to a process "whereby a nurse uses a syringe to pull out any contents remaining in the stomach to ensure the patient's stomach is absorbing the proper amount of fluid in the proper amount of time." Fishmann Decl. ¶ 47.

1  The standard of care within the local medical community is to check residuals ever

2  four hours."). Plaintiffs assert that the VA's failure to employ the proper aspiration-

3  prevention procedures caused Decedent to develop aspiration pneumonia, which in

4  turn caused his death.

5

6      Plaintiffs' claim fails for the simple reason that Plaintiffs have not proven by

7  a preponderance of the evidence that any failure by the VA to prevent aspiration

8  pneumonia caused Decedent's death. Most critically, Plaintiffs failed to establish

9  that aspiration pneumonia was the cause of death. The only evidence offered by

10  Plaintiffs in support of their argument that aspiration pneumonia was the cause of

11  death was the statement of their expert, Dr. Boylen, who testified that Decedent

12  developed aspiration pneumonia, which was the "immediate cause of [Decedent's]

13  untimely death on October 22, 2009." Boylen Decl. ¶ 21. However, Decedent's

14  autopsy report concluded that Decedent "succumbed to pulmonary edema (fluid in

15  the lungs)." See Ex. 9, pg. 4. At trial, Plaintiffs failed to attack the autopsy report's

16  conclusion at the cause of death, or link the alleged aspirational pneumonia to

17  pulmonary edema in anyway.

18

19      Moreover, Plaintiffs failed to establish that Decedent contracted aspiration

20  pneumonia during his stay at the VA. The only evidence Plaintiffs introduced in

21  support of their assertion that Decedent contracted aspiration pneumonia while at

22  the VA is a conclusory statement from their expert, Dr. Boylen, who states that

23  "once a patient aspirates, as [Decedent] did, he has hospital-acquired pneumonia."

24  Boylen Decl. ¶ 21. However, the record is replete with evidence that Decedent did

25  not develop aspiration pneumonia. Specifically, the results of two bronchoscopies

26  conducted by the VA—one on September 2, 2009, the other on October 1, 2009—

27  determined that Decedent did not have aspiration pneumonia. See Fishmann Decl.

28  ¶76 (noting that the medical records from the September 2 bronchoscopy "would

8

1  have indicated aspiration pneumonia through lesions or material in the lungs," but

2  "only confirmed secretions in the airways of the lungs"),[5] Ex. 1, pg. 2419 (note

3  from staff physician David Webb stating that bronchial washings performed during

4  Decedent's September 2 bronchoscopy "did not grow an organism, indicating that

5  [Decedent] may not have had a pneumonia."); see also  Fishmann Decl. ¶76 (noting

6  that the medical records from the October 1 bronchoscopy "would have indicated

7  aspiration pneumonia through lesions or material in the lungs" but did not).  Indeed,

8  Dr. Boylen admitted at trial that, based on his review of the record, the October 1

9  bronchoscopy—the one closest in time to Decedent's death—established that

10  Decedent did *not* have aspiration pneumonia.  Moreover, Decedent's autopsy report

11  concluded that Decedent "succumbed to pulmonary edema (fluid in the lungs)[,]"

12  without so much as mentioning aspiration pneumonia.  See Ex. 9, pg. 4.  In short,

13  the documentary evidence presented in this case refutes Dr. Boylen's conclusory

14  assertion that Decedent contracted aspiration pneumonia during his stay at the VA.

15

16  Finally, even assuming that Decedent contracted aspiration pneumonia (and

17  that this illness, in turn, caused his death), Plaintiffs failed to demonstrate by a

18  preponderance of the evidence that the VA's lack of care caused Decedent to

19  develop aspiration pneumonia.  At trial, Plaintiffs introduced some evidence that

20  the head of Decedent's bed was not elevated at all times, and that his residuals were

21  not always checked.[6]  Even assuming that these periodic failures demonstrate that

22

23      [5] At trial, Dr. Boylen testified that the secretions found in Decedent's right
24  lung were "more likely than not related to infection."  The Court finds Dr.
    Fishmann's testimony that the secretions were *not* a sign of infection more credible
25  than Dr. Boylen's testimony that they were.
26

27      [6] Primarily, Plaintiffs' relied on the testimony of their expert Dr. Boylen, who
28  stated in his trial declaration that: "[Decedent's] records fail to indicate that such

the VA's care of Decedent fell below the required standard of care,[7]  Plaintiffs offered no evidence connecting these failures to the alleged development of aspiration pneumonia.  Had Plaintiffs, or their expert, identified some correlation between the times these precautions were not taken and Decedent's development of aspiration pneumonia, the inference that Decedent died because he was not properly treated might have been warranted.  Neither have done so here; as a result, the Court is unable to draw the conclusion that the alleged lack of care caused Decedent's death.

---

aspiration precautions were routinely followed.  There is no indication that [Decedent]'s bed remained elevated at all times and there is no indication that staff checked his residual volume prior to administering tube feedings ."  Boylen Decl. ¶ 19; see also Bolyen Decl. ¶ 13 ("Physicians rely on nursing staff to follow the nursing maxim 'if it is not documented, it was not done.'").  However, Decedent's medical records specifically note that Decedent's head was elevated to at least 30 degrees on 103 of the 144 days on which Decedent was being fed via G-tube (71.5% of the time) and that Decedent's residuals were checked 117 of the 144 relevant days (or 81.25% of the time).  At best, the record demonstrates that Decedent's head was not *always* elevated and that his residuals were not *always* checked.

[7] The Court is skeptical that this is so.  At trial, the Government introduced undisputed testimony that the community standard of care does not require a person being fed via G-tube to have his or her elevated at *all times*.  See Fishmann Decl. ¶ 50.  "The community standard does not require that the VA maintain the head of the bed at [30 degrees or greater] at all times because there are times when the head of the bed must be lowered . . . . [to] clean a patient or conduct some medical procedures or examinations . . . . [or] if a patient's blood pressure is too low, the more appropriate position may be to lie the patient in a less elevated position to encourage blood circulation to the upper part of the body.").  Similarly, the Government provided a plausible, and undisputed, explanation for why Decedent's residuals were not checked every day: on certain days, Decedent was not fed via G-tube.  See, e.g. Ex. 1 pgs. 2436 and 2492 (noting on September 3 and 4, 2009 "G-tube left side, clamped").

**D. Pressure Sores**

Plaintiffs further allege that the VA was negligent because it failed to prevent Decedent from developing pressures sores, and that this failure caused Decedent's death. Both before and during his stay at VA Long Beach, Decedent developed pressures sores on various parts of his body. Pressure sores, also known as bed sores or "decubitus ulcers," are

> localized injur[ies] to the skin and/or tissue usually over a bony prominence, such as a hip, tailbone or heel, that results from the pressure of the weight of the body in combination with sear and/or friction. There are various stages to the development of a pressure sore. Stage IV is the most severe stage and may include exposed bone.

Fishmann Decl. ¶ 25.[8] Upon admission to the VA, Decedent had a Stage IV pressure sore on his tailbone and a Stage III pressure sore on his left heel. Edgar Decl. ¶ 21, Ex. 1 pp. 5269, 5274-75. During his time at the VA, Decedent developed additional bed sores on his left and right hips and one near the base of his penis. Edgar Decl. ¶ 32, 39, 48, 52, 63. These sores varied in their degree of severity throughout Decedent's stay at the VA. Id.

---

[8] "There are six stages to the development of a pressure ulcer. There are two preliminary stages: (1) suspected deep tissue injury, where the skin is intact and purple or intact with a blood-filled blister, and 2) unstageable, where [sic] the wound is covered with dead tissue. At Stage I, the skin is intact and red . . . . At stage II, there is a superficial break in the skin, such as an open blister. At Stage III, there is a loss of tissue and there is an undermining, or bowl shape to the wound that curves into the skin. At Stage IV, which is the most severe stage, skin is missing down to the muscle or tendon level, or bone is exposed." Edgar Decl. ¶ 23.

11

1    According to Dr. Boylen, the standard of care in treating pressure sores
2 required the VA to rotate Decedent every two hours, and required the VA to keep
3 his skin "clean, dry, and free from prolonged periods of unrelieved pressure."
4 Boylen Decl. ¶ 12.  Plaintiffs allege that the VA did not employ the proper care to
5 prevent Decedent developing pressure sores, and that this failure was a "substantial
6 factor" in causing his death.  Boylen Decl. ¶ 16.

7

8    Like their aspiration-pneumonia theory of liability, Plaintiffs' pressure sores
9 theory fails because they have failed to prove an essential element of their claim:
10 causation.  That is, even assuming that the VA's care of Decedent's pressure sores
11 fell below the applicable standard of care,[9] Plaintiffs failed to prove by a

12    _____

13    [9] The Court is again skeptical that this is the case. Dr. Boylen testified that
14 there was "*no* documentation in [Decedent's] medical chart that verifies that he was
turned and repositioned at least every two hours. Also, there is no documentation
15 that suggests that staff kept his skin clean and dry at all times in light of his chronic
16 incontinence." Boylen Decl. ¶ 13 (emphasis added). However, Decedent's medical
records include at least some notation that Decedent was rotated every two hours on
17 177 of the 183 days during Decedent's stay at the VA. Moreover, the VA took
18 extensive other precautions, such as developing a "skin integrity plan of care," each
designed to reduce Decedent's risk of developing pressure sores. See Fishmann
19 Decl. ¶¶ 38-39; see also Ex. 1 pp. 5270-77. Similarly, Decedent's medical records,
20 VA policy, and the testimony of key VA staff all indicate that Decedent was
regularly cleaned. The VA "requires staff to keep a patient clean and dry," and it
21 was "probable that staff cleaned [Decedent] him numerous times during the day
22 after he soiled himself." Woo Decl. ¶ 24; see also Woo Decl. ¶ 26 ("[T]he VA
requires staff to perform daily activities of living for patient, like bathing, toileting
23 and oral care."). Moreover, Decedent's medical records include dozens of notations
24 indicating that Decedent's catheter—the likely cause of Decedent's pressure sore
near his penis—was cleaned on a regular basis. See, e.g. Ex. 1, pp. 2199, 2221,
25 2234, 2415, 2413, 2437, 2700, 2705, 2875, 2885. Thus, at best, the record
26 demonstrates that Decedent was not *always* rotated and his skin was not *always* kept
clean and dry. Even assuming Plaintiffs' best case—that, *on occasion*, Decedent
27 was not rotated and his skin was not kept clean—Plaintiffs have failed to provide
28 any evidence connecting these failures to Decedent's death. Like their aspiration

preponderance of the evidence that this failure caused his death.   The only evidence submitted by Plaintiff linking Decedent's pressure sores to his death was Dr. Boylen's conclusory statement that Decedent's "wounds and infections never healed, permanently increased his morbidity and, to a reasonable degree of medical probability, were a substantial factor in causing his untimely death." Boylen Decl. ¶ 16. This opinion contradicts Dr. Boylen's earlier opinion that Decedent died of aspiration pneumonia. See Boylen Decl. ¶ 21. Moreover, as discussed above, Decedent's autopsy report concluded that Decedent died of pulmonary edema. See Ex. 9, pg. 4. Plaintiffs have offered no evidence whatsoever connecting Decedent's pressure sores to his pulmonary edema, and thus have failed to demonstrate by a preponderance of the evidence that the VA's alleged shortcomings in treating Decedent's pressure sores caused his death.

### E. Hospital-Acquired Infections

Plaintiffs further allege that the VA did not properly treat Decedent because it did not implement the appropriate precautions to prevent Decedent from acquiring infections while at the VA.   In his testimony, Dr. Boylen articulated two specific precautions that the VA was required to take to prevent Decedent from acquiring infections.   First, the "[a]pplicable standard of care required that Mr. Bryant's catheter be cleaned with soap and water at the end of each shift and replaced every month[.]" Boylen Decl. ¶ 17. Second, the VA was required to "us[e] gloves and gowns and wash[] their hands before they provided care to [Decedent]." Boylen Decl. ¶ 18.   However, like their previous two theories of liability, Plaintiffs' hospital-acquired infections theory fails because they have failed to establish

pneumonia theory of liability, Plaintiffs have failed to identify any correlation between the instances in which the care was not delivered and Decedent's death.

causation.  That is, even assuming that certain required precautions were not taken,[10]

Plaintiffs have not proven by a preponderance of the evidence that these failures

caused Decedent's death.  The only evidence linking Decedent's allegedly avoidable

hospital-acquired infections to his death was Dr. Boylen's conclusory statement that

these infections "caused substantial further injury to [Decedent] and played a

substantial factor in his overall decline and untimely death."  Boylen Decl. ¶ 16.

Similar to his statement that Decedent's pressure sores led to his death, this

conclusion is contradicted by Dr. Boylen's earlier opinion that Decedent died of

aspiration pneumonia.  See Boylen Decl. ¶ 21.  Even absent this contradiction,

---

[10] Again, the Court is skeptical that this is the case.  According to Dr. Boylen, "the medical records fail to document" that Decedent's catheter was cleaned at the end of each shift and replaced every month.  Boylen Decl. ¶ 17.  However, Decedent's medical records include dozens of notations indicating when Decedent's catheter was cleaned and replaced.  See, e.g. Ex. 1, pp. 2199, 2221, 2234, 2415, 2413, 2437, 2700, 2705, 2875, 2885.  Moreover, although there were certain times when Decedent's charts failed to indicate that his catheter was cleaned and/or changed, there were reasons for these absences: at certain times, Decedent was in a diaper instead of on a catheter, and at others, he was anuric (that is, unable to urinate), obviating the need for a catheter.  See, e.g. Ex. 1 pp. 5125, 5112, 5107, 5014, 1764.  Moreover, as to Dr. Boylen's assertion that the VA did not wear gloves and gowns and did not wash their hands when treating Decedent, Decedent's medical records are littered with indications that Decedent was on safety precautions, which required VA staff to use gloves and wear a mask when treating Decedent, throughout his stay at the VA.  See Ex. 1, pp. 1895, 1976, 2407, 2563, 2822, 4006, 4532, 4791, 4806, 4808, 4852.  More generally, the VA requires that a nurse "wear gloves whenever she touches the patient, regardless of whether the nurse is cleaning the patient, bathing the patient, or repositioning the patient."  Woo Decl. ¶ 31.  Moreover, even assuming Plaintiffs' case scenario—that, *on occasion*, Decedent's catheter was not replaced and gloves were not used—Plaintiffs have failed to provide any evidence connecting these failures to Decedent's death.  Like their aspiration pneumonia and pressure sores theories of liability, Plaintiffs have failed to identify any correlation between the instances in which the care was not delivered and Decedent's death.

1  Plaintiffs have offered no evidence whatsoever connecting Decedent's pressure
2  sores to Decedent's stated cause of death—pulmonary edema.  See Ex. 9, pg. 4.
3  Thus, Plaintiffs have failed to demonstrate by a preponderance of the evidence that
4  the VA's alleged shortcomings in preventing Decedent from acquiring infections
5  caused Decedent's death.

6

7  **F. Malnutrition**

8

9  Plaintiffs further allege that the VA was negligent because it failed to
10 properly nourish Decedent while caring for him.  According to Dr. Boylen,
11 Decedent suffered from "chronic dehydration and malnutrition" throughout his stay
12 at the VA.  Boylen Decl. ¶ 22.[11]  Dr. Boylen further testified that "there is no excuse
13 for VA Long Beach's failure to improve [Decedent's] nutritional status once the G-
14 tube was placed."  Boylen Decl. ¶ 22.  However, Plaintiffs failed to introduce any
15 evidence as to what Defendant *should* have done to prevent malnutrition—and thus
16 failed to articulate what the standard of care for preventing malnutrition was.
17 Moreover, the mere fact that Decedent was malnourished is not, by itself, sufficient
18 to establish negligence, nor that it was a cause of death.  See, e.g. Bushling v.
19 Fremont Med. Ctr., 117 Cal. App. 4th 493, 510 (2004).

20

21 **G. Changing Decedent's Status from "Full Code" To "Do Not**
22 **Resuscitate"**

23

24 Finally, Plaintiffs argue that the VA was negligent because it impermissibly
25 changed Decedent's status from "full code"—that is, the use of all life-saving

26 _____

27 [11] Decedent was suffering from malnourishment before he was admitted to the
28 VA.  See Ex. 4, pp. 2, 12-13.

1    procedures—to "Do Not Resuscitate" ("DNR").   Decedent's status was "Full Code"

2    until a few days before his death.  On October 19, 2009, Dr. Waddington learned

3    that Decedent had signed an advanced directive in 2003 that "expressed

4    [Decedent's] direction to remove or withhold all life-saving treatments, if his

5    condition was terminal."  Waddington Decl. ¶ 27.  Upon learning that Decedent had

6    signed an advanced directive, Dr. Waddington requested a meeting with the VA's

7    ethics committee to obtain guidance.  Waddington Decl. ¶ 28.  An ethics committee

8    meeting was convened on October 20, 2009; after the meeting, the committee

9    informed Dr. Waddington that it "support[ed] following the patient[']s advance

10    directive" and instructed him not to "initiate coding measures" (i.e. CPR) if such

11    measures would "cause more harm" to Decedent.  Waddington Decl. ¶ 32.  This

12    decision was subsequently communicated to other VA personnel.  Waddington

13    Decl. ¶ 34; Mazdisnian Decl. ¶27.  Two days later, on October 22, 2009, Decedent

14    went into cardiac arrest and died.  Mazdisian Decl. ¶ 28.  VA staff did not initiate

15    CPR, in accord with the ethics committee's decision.  Mazdisian Decl. ¶ 28.

16

17        Plaintiffs contend that this change ignored the express terms of Decedent's

18    advanced directive, which gave his daughter, Cynthia Bryant, "full power and

19    authority to consent, refuse consent, or withdraw consent to any type of health care

20    procedures[,]" including the decision of whether to withhold CPR.  Ex. 7 pg. 2.[12]

21    Plaintiffs contend that the VA's failure to consult Cynthia before changing

22

_____

23        [12] A different provision in the advanced directive provides that if Decedent
    was diagnosed with an "incurable injury, disease, or illness certified by two
24    physicians to be a terminal condition, and if the application of life-sustaining
    procedures would serve only to artificially prolong the moment of my death, and if
25    my treating physician determines that my death is imminent, whether or not life-
    sustaining procedures are utilized, then I desire that all life-sustaining treatment be
26    withheld or removed."  Ex. 7 pg. 3.
27

28

1    Decedent's status from Full Code to DNR was negligent.  However, even assuming

2    the VA's failure to obtain Cynthia's approval before changing Decedent's status

3    was negligent, this decision cannot support Plaintiffs' wrongful death claim.  As

4    Plaintiffs admit, the change from Full Code to DNR did not *cause* Decedent's

5    death—even if CPR had been administered, both Defendant's *and Plaintiffs'* experts

6    testified that it would not have saved Decedent's life.  See Fishmann Decl. ¶ 74.[13]

7    Plaintiffs have therefore failed to establish causation, a necessary element of their

8    wrongful death cause of action.

9

10   **II.    PLAINTIFFS' ELDER ABUSE ACT CLAIM**

11

12          **A.    Jurisdiction**

13          The Government argues that the doctrine of sovereign immunity bars this

14   Court from entertaining Plaintiffs' Elder Abuse Act claim.  Specifically, the

15   Government argues that the "intentional torts" exception to the FTCA, 28 U.S.C. §

16   2680(h), revokes the Government's waiver of sovereign immunity as to Plaintiffs'

17   Elder Abuse Act claim.

18

19          Section 2680(h) provides that the FTCA does not apply to "[a]ny claim

20   arising out of assault, battery, false imprisonment, false arrest, malicious

21   prosecution, abuse of process, libel, slander, misrepresentation, deceit, or

22   interference with contract rights."  28 U.S.C. § 2680(h).[14]  It is an exception to an

23   _____

24          [13] At trial, Dr. Boylen testified that "the failure to perform CPR did not
     directly cause [Decedent's] death.  I think he would have died anyway."

25

26          [14] Section 2680(h) includes an exception for "acts or omissions of
     investigative or law enforcement officers of the United States government" that is
27   inapplicable here.  28 U.S.C. § 2860(h).

28

1  exception: Section 2680(h) retains sovereign immunity for the United States for

2  claims arising out of the listed torts.  Although sometimes described as the

3  "intentional tort exception" because most of the listed torts are intentional, see, e.g.

4  Orsay v. U.S. Dept. of Justice, 289 F.3d 1125, 1132 (9th Cir. 2002),  it is "clear

5  [that] § 2680(h) does not include all intentional torts." Sheehan v. United States,

6  896 F.2d 1168, 1172 amended, 917 F.2d 424 (9th Cir. 1990).  Instead, only those

7  torts listed in Section 2680(h) are exempted from the FTCA's waiver of sovereign

8  immunity. Id.  A plaintiff may still bring suit against the United States for torts

9  *other* than those listed in Section 2680(h), even if those torts are intentional.

10

11      In determining whether a particular claim falls within Section 2680(h)'s

12  exception, a court must "look beyond a plaintiff's classification of the cause of

13  action to examine whether the conduct upon which the claim is based constitutes

14  one of the torts listed in § 2680(h)." Sabow v. United States, 93 F.3d 1445, 1456

15  (9th Cir. 1996); see also Xue Lu, 621 F.3d at 952 ("We focus our § 2680(h) inquiry

16  on whether conduct that constitutes an enumerated tort is essential to a plaintiff's

17  claim.") (internal citations and quotation marks omitted).  The Elder Abuse Act

18  makes certain remedies available to plaintiffs who prove by "clear and convincing

19  evidence that a defendant is liable for physical abuse, neglect, or financial abuse (as

20  these terms are defined in the Act), and that the defendant has been guilty of

21  'recklessness, oppression, fraud, or malice' in the commission of such abuse[.]"

22  Covenant Care, Inc. v. Superior Court, 32 Cal. 4th 771, 779, 779 (2004) (internal

23  citations and quotation marks omitted).  Here, Plaintiffs' Elder Abuse Act claim

24  arises out of allegations of *neglect*: the gravamen of Plaintiff's complaint is that

25  Defendants were aware of, and failed to appropriately care for, Decedent's pressure

26  sores, malnutrition, and other nondescript physical and psychological conditions.

27

28

1    See, e.g. Compl. ¶¶ 19, 20, 24, 30.[15]  The conduct giving rise to Plaintiff's Elder

2    Abuse Act claim does not constitute one of the torts listed in Section 2680(h);

3    therefore, Plaintiffs' Elder Abuse Act claim is not barred by the doctrine of

4    sovereign immunity.[16]  See Estate of David Burkhart v. United States 2009 U.S.

5    Dist. LEXIS 33897, at *37 (N.D. Cal. Apr. 21, 2009) (ruling on the merits of a

6    plaintiff's Elder Abuse Act claim asserted against the United States).

7

8         Therefore, the Court finds that the FTCA's waiver of sovereign immunity

9    applies to Plaintiff's Elder Abuse Act claim, and that it therefore has jurisdiction

10   over this claim.

11                      **B.    Merits**

12        As noted above, the Elder Abuse Act requires Plaintiffs to prove by clear and

13   convincing evidence 1) that the VA physically abused, neglected, or financially

14   abused Decedent (as those terms are defined in the Act)[17]; and 2) that Defendant

15

16   _____

17   [15] The Elder Abuse Act defines neglect as the "negligent failure of any person
     having the care or custody of an elder or a dependent adult to exercise that degree of

18   care that a reasonable person in a like position would exercise," including, but not

19   limited to, "[f]ailure to provide medical care for physical and mental health needs . .
     . [f]ailure to prevent malnutrition." Cal. Welf. & Inst. Code § 15610.67.

20

21   [16] By contrast, had Plaintiffs' Elder Abuse Act claim arisen out of allegations

22   that Decedent was physically abused while at the VA, their claim likely would have
     been barred under Section 2680(h): the Elder Abuse Act defines physical abuse to

23   mean, among other things, "assault" and "battery," two of the torts listed in Section

24   2680(h).

25

26   [17] In order to demonstrate neglect, the plaintiff must prove that the defendant
     1) had responsibility for meeting the basic needs of the elder dependent adult, such

27   as nutrition, hydration, hygiene, or medical care; 2) knew of conditions that made

28   the elder or dependent adult unable to provide for his or her own basic needs; and,

1  was guilty of "recklessness, oppression, fraud, or malice" in the commission of such

2  abuse.  Carter v. Prime Healthcare Paradise Valley LLC, 198 Cal. App. 4th 396, 404

3  (2011).[18]  Although recklessness is not defined in the Elder Abuse Act, the

4  California Supreme Court has held that the term

> refers to a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur.  Recklessness, unlike negligence, involves more than inadvertence, incompetence, unskillfulness, or a failure to take precautions but rather rises to the level of a conscious choice of a course of action with knowledge of the serious danger to others involved in it.

Delaney v. Baker, 20 Cal. 4th 23, 31-32 (1999) (internal citations and quotation marks omitted).

As discussed above, Plaintiffs have failed to prove by a *preponderance of the evidence* that the VA was *negligent* in treating Decedent.  They therefore cannot prove with *clear and convincing evidence* that VA staff acted *recklessly* in their treatment of Decedent.  Thus, Plaintiffs' Elder Abuse Act claim fails.

---

3) denied or withheld goods or services necessary to meet the elder adult's needs *with* knowledge that injury was substantially certain to befall the adult or with recklessness—that is, conscious disregard of the high probability of injury.  Carter, 198 Cal. App. 4th at 903-04; see also Covenant Care, Inc. v. Superior Court, 32 Cal. 4th 771, 783 (2004) ("[T]he statutory definition of neglect speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care.").  Moreover, the plaintiff must prove that the neglect *caused* the elder to suffer physical harm, pain or mental suffering.  Carter, 198 Cal. App. 4th at 904.

[18] Plaintiffs were also required to prove that Decedent was a resident of California and over the age of 65, see Carter, 198 Cal. App. 4th at 404.  There is no dispute that Decedent was over 65.

**III.   CONCLUSION**

For the reasons put forward in this Order, the Court finds that Plaintiffs have failed to carry their burden on both of their claims.  Thus, the Court enters judgment in favor of the Government.

IT IS SO ORDERED.

Dated: 4/17/13

_____

THE HON. STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE